IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHERI BOWEN, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 16-cv-00217 |
| CHICAGO BOARD OF ELECTION ) | |
| COMMISSIONERS, ) | Hon. Gary Feinerman |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S AMENDED RESPONSE TO DEFENDANT'S
L.R. 56.1 STATEMENT OF MATERIAL FACTS &
PLAINTIFF'S AMENDED ADDITIONAL STATEMENT OF MATERIAL FACTS**

**I.   THE PARTIES**

1.   The Board of Election Commissioners of the City of Chicago (the "Board") is a public entity which oversees the public election operations in the City of Chicago. The Board is comprised of several departments, which includes a Vote by Mail department (previously known as Absentee Voting department). (Dawn Downs Deposition ("Downs Dep.") at 9:2-10, transcript attached hereto as Exhibit A)

**Response**:   Undisputed.

2.   From August 1990 until her separation from employment on November 11, 2014, Plaintiff Sheri Bowen ("Plaintiff") was an employee of the Board. (Sheri Bowen Deposition ("Plaintiff's Dep.") at 10:1-3, transcript attached as Exhibit B)

**Response**:   Undisputed.

3.   At the time of her termination, Plaintiff was working as Supervisor of the Absentee Voting department of the Board, a position which she held since 2004. (Id. at 22:22-24:8)

1

**Response**:   Undisputed.

4.     While working as a Supervisor in the Absentee Voting department and at the time of her termination, Plaintiff reported directly to Dawn Downs, who was Manager of the Elections Support Division at the time of Plaintiff's termination (Downs Dep. At 10:1-4, 8:21-24)

**Response**:   Undisputed.

## II.    JURISDICTION AND VENUE

5.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331.

**Response**:   Undisputed.

6. Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

**Response**:   Undisputed.

## III.    PLAINTIFF'S EMPLOYMENT AND DUTIES

7.     As a Supervisor of the Absentee Voting department, Plaintiff was responsible for coordinating and monitoring absentee ballots during public elections, which included ensuring that untimely, or "too-late" absentee ballots were not counted in the election results. (Plaintiff's Dep. At 24:19-26:12)

**Response**:   Plaintiff does not dispute that she was the supervisor of the absentee voting department, and does not dispute that her responsibilities included overseeing and coordinating various phases of post-election absentee ballot handling, including review of ballots starting on Nov. 5, 2014, to determine if absentee ballots were "too late." However, Plaintiff disputes that she was "ensuring" such activities, or that she was involved in the counting of ballots or canvasing of results since the Board assigned employees that would be reviewing absentee

ballots and segregating "too late" ballots. Plaintiff Declaration, Exh. A, Par. 5-7), and provided written instructions to her staff to check for "too late" ballots (Id.)

8. As part of Plaintiff's fundamental duties and responsibilities, she was obligated to verify whether any absentee ballots were timely and to exclude any "too-late" absentee ballots. (Id. at 25:17-26:3)

**Response**: Plaintiff disputes that facts as paraphrased in this paragraph, but admits that as a supervisor, her responsibility was to oversee and coordinate staff in their review of absentee ballots to determine if they were timely and ballots that were determined to be "too late" were to be excluded. (Plaintiff Declaration, Exh. A, par. 5-7).

9. Plaintiff's annual salary at the time of her termination was $71,364. (Id., Deposition Exhibit 4)

**Response**: Plaintiff does not dispute the facts asserted in this paragraph.

10. Absentee ballots that were postmarked before the election date or which included a signed certification date prior to the election date should be counted as timely ballots. (Id. at 26:4-12)

**Response**: Plaintiff does not dispute the facts asserted in this paragraph.

11. To ensure that only timely ballots were counted, and that any "too-late" absentee ballots were excluded, Plaintiff was required to segregate untimely ballots into a separate tray. (Id. at 26:17-27:7)

**Response**: Plaintiff does not dispute that the procedure in place was to segregate "too late" ballots into a separate tray, so that such ballots would not be processed through the Agilis sorting machine, however Plaintiff's duties did not include counting votes for different races or tabulating the election results.

12. If any absentee ballot was untimely, or "too-late," based on the postmark date or signed certification date, that ballot should be kept separate from any timely ballots. (Downs Dep. at 27:2-7; Plaintiff's Dep. At 25:9-26:23)

**Response**: Undisputed.

13. Plaintiff did not follow the proper procedure for identifying "too-late" absentee ballots during the November 4, 2014 general election. (Plaintiff's Dep. at 41:13-22)

**Response**: Plaintiff disputes these assertions. Plaintiff printed up and distributed written instructions to Board staff that were assigned to review absentee ballots and sort out the "too late" ballots (Plaintiff's Dep. pg. 26-27) The Plaintiff's only omission was her failure on one day, Nov. 5, 2014, to verbally remind staff to check for "too late" ballots, an oversight resulting from not having an assistant supervisor, three times the number of absentee ballots as prior elections, and pressure from Dawn Downs to accelerate the process. (Plaintiff Declaration, Exh. A, par. 2, 4, 5, 12-18) The Plaintiff's omission occurred on only one day, Nov. 5, 2014, and not on any other date. (Bowen Dep., Exh. B, Exh. B, pg. 111-113)

14. Because Plaintiff did not follow the proper procedure for excluding any "too-late" absentee ballots during the general election, the Board developed a plan to correct Plaintiff's errors and to identify any "too-late" absentee ballots that were missed. This plan for identifying "too-late" absentee ballots due to Plaintiff's errors was memorialized in a memorandum dated November 7, 2014. (Id., Deposition Exhibit 2)

**Response**: Plaintiff does not dispute that Jeff Federke prepared and circulated a memo dated Nov. 7, 2014 addressing "Identifying Too-Late Absentee

4

Ballots" on or about Nov. 7, 2014, after one transfer case of absentee ballots received Nov. 5, 2014 was processed without being sorted first. Plaintiff does not dispute the content of the Nov. 7, 2014 memorandum, which speaks for itself. Plaintiff also does not dispute that Jeff Federke's memo does not blame Plaintiff or make negative references, but included Plaintiff in the process. (Bowen Dep., Exh. B, Exh. B, pg. 113-114).

15. As the Supervisor in charge of the Absentee Voter department, Plaintiff would print out instructions for her subordinates that explained the proper procedure for evaluating absentee ballots. (Id. at 25:17-24, 27:16-28:5) The procedure for counting absentee ballots has been in place since at least 2008. (Id. at 28:14-24)

**Response**: Plaintiff does not dispute that she prepared and distributed instructions for staff of the absentee ballot department that were sorting for "too-late" absentee ballots, and that such procedures were used for prior elections at least since 2008, and for the 2014 election. Plaintiff disputes that the paraphrasing in Par. 15 accurately summarizes her deposition testimony, also the procedure did not address counting, but sorting ballots (Plaintiff Declaration, Exh. A, par. 6, 7, 17)

IV. **PLAINTIFF'S TERMINATION**

17. During the November 4, 2014 general election, Plaintiff failed to exclude untimely, or "too-late," absentee ballots. (Plaintiff's Dep. at 41:17-19; 45:1-10)

**Response**: Plaintiff disputes the facts as asserted in this paragraph. Plaintiff's only mistake was failing to verbally remind her staff to check for "too late" absentee ballots on only one day, Nov. 5, 2014, and only for one transfer case, that was received on Nov. 5, 2014. (Bowen Dep., Exh. B, Exh. B, pg. 111-113; Plaintiff

5

Declaration, Exh. A, par. 5, 12-13, 17-19) Furthermore, this was a team process, and Dawn Downs and Jeff Federke shared responsibility (Torres Declaration, Exh. I, par. 16)

18. Plaintiff did not properly screen absentee ballots that were dated November 5, 2014. (Id.)

**Response**: Plaintiff disputes the facts as asserted in this paragraph. See Responses to Par. 13 and 17, above.

19. Plaintiff's mistake in failing to look for "too-late" absentee ballots during the November 4, 2014 election was a major mistake. (Id. at 45:9-10)

**Response**: Plaintiff does not dispute that she referred to her omission as a "major mistake" at her deposition in December 2016, and also as a "basic mistake" but disputes that the omission had any effect on the election, or in any way disenfranchised voters. (Plaintiff Declaration, Exh. A, par. 13, 17, 18, 19, 26, 34)

20. Plaintiff's mistake in failing to look for November 5, 2014 absentee ballots was a mistake relative to her fundamental job duties as supervisor at the Absentee Vote department at the Board. (Id. at 45:11-14)

**Response**: Plaintiff does not dispute that her omission to verbally remind staff to check for "too late" ballots was within the scope of her job duties, but disputes that it was her personal or individual duty to review or look for Nov. 5, 2014 absentee ballots. (Plaintiff Declaration, Exh. A, par. 5, 6, 7, 13-19)

21. Plaintiff's mistake garnered the attention of leadership in the Republican and Democratic parties relative to the November 4, 2014 general election. (Id. at 45:20-24)

**Response**: Plaintiff disputes that her omission was the reason for the

6

attention of the Republican and Democratic party attorneys that were reviewing the statewide election for treasurer between Frerichs and Cross. (Downs Dep, pg. 29:10-23; see official results of Treasurer election from State Board of Elections, attached as Exh. D and letter from James Scanlon to William Quinlan, attached as Exh. E). In addition, the paragraph misstates the deposition testimony out of context, and incorrectly references "Zack" as a Democratic Party leadership, when in fact, he was an attorney. It is commonly known among election attorneys that Michael Kasper is the Democratic Party's attorney in Illinois, and he was not present. The Republican Party was pressuring the Board before the Nov. 4, 2014 (Torres Declaration, Exh. I, par. 16)

22.   Plaintiff's mistake called into question the integrity of the general election results. (Id. at 46:17-24)

**Response**:   Plaintiff disputes the facts asserted in this paragraph. There were less than 100 absentee ballots that may have been erroneously processed out of 1,364,436 ballots cast in Cook County (of which 668,033 were cast in Chicago), for a statewide race that had 3,680,417 ballots cast (Plaintiff Declaration, Exh. A, par. 24, 34; see also statewide & Chicago Treasurer results, Exh. D). The processing of less than 100 "too late" absentee ballots by staff members did not jeopardize the election and such claims are false. (Id.) Furthermore, there were no lawsuits filed, no state's attorney investigation, no criminal charges or other repercussions. (Bowen Dep. pg. 69:18-23, pg. 111-118; Downs Dep. pg. 45)

23.   In all the years working for the Board, Plaintiff is not aware of any similar mistake, any individual that made a similar mistake, or any mistake that caused similar problems like the one she caused. (Id. at 47:1-18)

**Response**: Plaintiff does not dispute that during her 24-1/2 years she has not made such an omission, and was not aware of mistakes with the processing of "too late" ballots, but there were other mistakes. (See generally Bowen Declaration Exh. A, Torres Declaration Exh. I, and Chism Declaration, Exh. J) Plaintiff disputes the reference to phrase about "similar problems like the one she caused" which is not defined and presumed to refer to the same "too late" omission. (Bowen Dep., Exh. B, Exh. B, pg. 68:17-21, 101:7-12; Plaintiff Declaration, Exh. A, par. 31) There were not repercussions from the process of less than 100 "too late" ballots, so Plaintiff disputes that there were "similar problems (See generally Bowen Declaration Exh. A, Torres Declaration Exh. I, and Chism Declaration, Exh. J)

24. After the initial mistake in allowing "too-late" ballots to be counted, Plaintiff exacerbated the problem by supplying her supervisor, Dawn Downs, with inaccurate vote totals, which failed to deduct the "too-late" ballots that had improperly been included in the initial vote totals. (Id. at 56:10-24; 64:13-20)

**Response**: Plaintiff does not dispute that one sheet of ballot totals was provided to her by Mark August was inaccurate and that she did not notice that Mark August had failed to hand write his total upon. Plaintiff disputes that the omission was her fault, as Mark August took responsibility. (Bowen Dep. pg. 52-55, pg. 123:24 to 124:1-5)

25. On November 7, 2014, after Plaintiff admitted that she forgot to check for "too late" ballots from November 5, 2014, and after a plan was developed to ameliorate the problems caused by Plaintiff's initial mistake, Plaintiff continued to miss "too-late" ballots that should have been excluded, compounding her initial mistakes by potentially including additional "too late" absentee ballots in the

8

election results. (Downs Dep. at 25:19-28:5; attached as Exhibits C and D are two memorandums, dated November 11, 2014 and December 8, 2014, respectively, which were prepared by Dawn Downs in order to describe and memorialize Plaintiff's performance failures during the November 4, 2014 general election).

**Response**: Plaintiff does not dispute that on Nov. 7, 2014 the "too late" ballot issue was reported to her, and that Jeff Federke distributed a memo about sorting absentee ballots, but Plaintiff disputes that she continued to miss "too late" ballots that should have been excluded, and disputes that she compounded her initial omission, since there was only one transfer case dated Nov. 5, 2014 that was not properly processed. (Bowen Dep., Exh. B, pg. 111-112; Plaintiff Declaration, Exh. A, par. 17-21, 23-24). Plaintiff is a thorough worker and did not "miss" any "too late" ballots. (Chism Declaration, Exh. J, 16-19)

26. On November 11, 2014, Plaintiff was terminated for failing to meet the Board's performance expectations, specifically for failing to comply with the Board's procedures for processing absentee envelopes and ballots during the November 4, 2014 general election. (Downs Dep. at 25:19-28:5; Plaintiff's Dep. at 66:14-19)

**Response**: Plaintiff does not dispute that she was terminated on Nov. 11, 2014, but disputes the remaining facts and false explaination which are the subject of her complaint. (Bowen Declaration, Exh. A) Plaintiff was not provided a specific reason for her termination at the time of termination, and asserts that her termination was based upon her race and gender as an African American woman, to allow a Caucasian Male to take over her position (Plaintiff Declaration, Exh. A, par. 29, 32-36; Torres Declaration, Exh. I, and Chism Declaration, Exh. J)

9

27. Dawn Downs (Caucasian Female) agreed with the decision to terminate Plaintiff's employment. (Downs Dep. at 64:15-17)

**Response**: Plaintiff does not dispute that Dawn Downs so testified at her deposition in this litigation. Plaintiff asserts that Dawn Downs, a Caucasian Female and Jeff Federke, a Caucasian Male, share responsibility for any "too late" ballots that may have been processed. Torres Declaration, Exh. I, par. 16.

28. Plaintiff admits that the reason she was terminated was because she failed to check for "too-late" absentee ballots during the November 4, 2014 general election. (Plaintiff's Dep. at 66:14-19)

**Response**: Plaintiff does not dispute that on December 22, 2016, at her deposition, she was aware that the Board claimed that she was terminated based upon her failure to check for "too late" absentee ballots. Plaintiff was not told the reason for termination when she was terminated two years prior, nor afforded an opportunity to review allegations against her, or have a hearing, or other input into the Board's action. (Plaintiff Declaration, Exh. A, par. 29, 32)

29. Plaintiff admits that some discipline against her was warranted, but believes that she should only have been suspended instead of terminated. (Id. at 66:20-67:22)

**Response**: Plaintiff does not dispute that the Board could have imposed discipline, including a suspension of 2-4 weeks, or until the final count of absentee ballots to see what the outcome was going to be, to see if a lawsuit would be filed, or there were repercussions of any nature; Plaintiff does not dispute that the Board could have suspended her until the full investigation was completed. (Plaintiff's

10

Dep. at 68) Plaintiff should not have been terminated. Torres Declaration, Exh. I and Chism Declaration, Exh. J.

30.     Plaintiff believes that a two week to a one month suspension by the Board for her infractions during the November 4, 2014 election would have been warranted and appropriate. (Id. at 69:16-23)

**Response**:   Plaintiff does not dispute that she conceded at her deposition that a 2-4 week suspension could have been imposed. See also Response to Par. 29.

V.     **PLAINTIFF'S CLAIM AGAINST THE BOARD**

31.     On November 30, 2015, Plaintiff filed her Complaint against the Board in state court, which was removed to this court on January 8, 2016. (ECF No. 1)

**Response**:   Undisputed.

32.     The Court dismissed Counts III (state law retaliation) and counts IV (Illinois Whistleblower Act) (Id.)

**Response**:   Undisputed.

33.     Plaintiff's remaining claims against the Board allege race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). (Id.)

**Response**:   Plaintiff does not dispute Count I ("Racially Biased Emploment Discrimination") and Count II ("Gender Biased Employment Discrimination") remain claims against the Board. (Dkt. #1)

34.     Plaintiff alleges that the Board violated Title VII by discharging her based on race and gender. (Id.)

**Response**:   Undisputed.

35.     In support of her Title VII claims, Plaintiff alleges the following:

11

1. her job position was replaced by a (Caucasian) male. (Id. at ¶ 12.)

2. throughout her employment, Plaintiff was not given the same compensation as similarly situated males and similarly situated Caucasians. (Id. at ¶ 13)

3. Plaintiff was discharged from her position because of her race (African American). (Id. at ¶ 16)

4. Plaintiff received less compensation than similar non-African American employees despite having higher educational credentials. (Id. at ¶ 17)

5. Plaintiff's position was given to a Caucasian male despite her qualifications being higher and having worked for the agency for 24 years (Id. at ¶ 18)

6. Plaintiff was discharged from her position because of her gender. (Id. at ¶ 21)

7. Plaintiff's position was given to a male despite her qualifications being better and having worked for the agency for 24 years. (Id. at ¶ 22)

**Response**: Plaintiff does not dispute that the excerpted paragraphs are contained within her complaint, but the paragraphs are an incomplete recitation of the complaint.

## VI. NO SIMILARLY SITUATED INDIVIDUALS OUTSIDE PLAINTIFF'S PROTECTED CLASS WERE TREATED MORE FAVORABLY

36. Plaintiff's income was significantly increased over the 24 years that she worked at the Board, including in 2013. (Plaintiff's Dep. at 76:1-77:10, 78:15-17) These increases were approved by her supervisor, Dawn Downs. (Id. at 77:5-10)

**Response**: Plaintiff does not dispute that she started her career with the Board as an hourly employee and over 24 years she received increases to her income. However, Plaintiff's increases were not commensurate with increases given to other employees, with no increases from 2009-2013. (Plaintiff Declaration, Exh.

12

A, par. 27, Bowen Dep. pg 77-78) Plaintiff does not dispute that Dawn Downs approved increases in 2009 and 2013.

37. Steven Cieslicki (Caucasian Male), was hired to replace Plaintiff as supervisor in the Absentee Voter department after her termination. (Plaintiff's Dep., Deposition Exhibit 4). Mr. Cieslicki's annual salary in 2015 was $61,488, which was almost $10,000 less than Plaintiff's annual salary at the time of her termination in 2014. (Id.)

**Response**: Plaintiff does not dispute that Steve Cieslicki, a Caucasian Male was transferred from a different department to replace Plaintiff as the supervisor of the absentee department, but disputes the characterization about Mr. Cieslicki's salary, because the reported salary in February 2015 was the salary from his prior position, because his salary could not be increased unless a request is submitted in May or June of the prior year and would go into effect in January of the next year. (Bowen Dep., Exh. B, pg. 78-79)

38. The racial and gender composition of department supervisors at the Board who were paid a higher annual salary than Plaintiff are as follows: one African American Male (Clint Hurde), two African American Females (Valerie Irons, Theresa Howard), one Hispanic Female (Rose Torres), and one Caucasian Male (Mark August). One Hispanic Female (Sandra Aspera) was paid a lower annual salary than Plaintiff. (Id., Deposition Exhibit 4)

**Response**: Plaintiff does not dispute that she researched and prepared Exhibit 4 based upon data from the City of Chicago website portal, or the racial and gender descriptions of the persons listed therein, and adds that Dawn Downs is a Caucasian Female and Jeff Federke a Caucasian Male as shown on Exhibit 4.

13

**PLAINTIFF'S ADDITIONAL STATEMENT OF MATERIAL FACTS**

1. Sheri Bowen has been an employee of the Board for over 24 years, and never received a written or verbal reprimand, and there was no negative, or adverse, information contained in her personnel file. (Bowen dep. at pg. 109-110; Torres Declaration, Exh. I and Chism Declaration, Exh. J)

2. During Dawn Downs' 12 to 14 year tenure as a manager, admitted that no employee has ever, before Plaintiff, been terminated due to an employee error (Downs Dep., Exh. C, pg. 22:22-24 to 23:1-2), and Dawn Downs has never recommended termination of an employee (Downs Dep., Exh. C, pg. 17:17-24)

3. Lance Gough is the executive director of the Board, Kelly Bateman is the assistant executive director, and both are management personnel above Dawn Downs. (Downs Dep., Exh. C pg. 22:2-16)

4. Supervisors, such as Sheri Bowen, did not have authority to discipline or transfer employees in their departments, but such authority was vested in upon upper level management, including Dawn Downs, executive director Kelly Bateman or director Lance Gough. (Bowen Dep., Exh. B, pg.87-90, 125; Downs Dep. Exh. C, pg. 22)

5. Sheri Bowen experienced overt and intentional gross insubordination from one of her assigned staff members, Alfonso Belt, when Mr. Belt told Sheri Bowen that he did not recognize her as his supervisor, that he took direction only from Dawn Downs or Arlene Rios, was very disrespectful to other employees, and threatened to "slap the shit out of" Sheri Bowen (Bowen Dep., Exh. B, pg. 87-91; Chism Declaration, Exh. J. par.11-13)

6. Dawn Downs did not recall a written policy about progressive

discipline, but admitted that there were instances of verbal warnings, written warnings and discipline. (Downs dep. at pg. 16:23-24 and 17:1-8)

7. Although no employee has been previously terminated for an employee error (Downs Dep., Exh. C, pg. 22:22-24 through 23:1-2), there was an employee that was transferred to a different department with a pay decrease as a result of an employee error (Id.) and others were suspended due to fraudulently falsifying mileage reimbursement forms (Id. at 23-25)

8. The Board has a policy on violence at the workplace (Downs dep. pg. 20:10-12), and Downs had knowledge of verbal threats of violence between employees, which also involved a letter opener used as a weapon, but the employees involved were not terminated (Downs Dep., Exh. C, pg. 19-20).

9. Every election there were employee mistakes made in every department of the Board, but when those mistakes occurred, the Board's custom and practice has been (and continues) to find a solution to fix the problem, without employee termination or harsh punishment (Bowen Dep., Exh. B, pg. 68:17-21, 101:7-12; Plaintiff Declaration, Exh. A, par. 31; *Kerlin* complaint, Exh. F; Torres Declaration, Exh. I, Chism Declaration, Exh. J)

10. There were numerous incidents of employee conduct that was worse than conduct alleged against Plaintiff, for which employees were not terminated, including ghost pay roll allegations, inappropriate content on Board computers, knowingly picking up checks for a person that resided outside of Chicago, and workplace altercations involving a weapon. (Plaintiff Declaration, Exh. A, par. 31, Bowen Dep., Exh. B, pg. 106-108, 123-124; Downs Dep., Exh. C, pg. 18-20, 22-25; Torres Declaration, Exh. I, Chism Declaration, Exh. J)).

11. When the Board adopted touch screens in 2006, there numerous mistakes that were made by employees in other departments, not the absentee department, and the errors were fixed, but the Board did not discipline or terminate any employees. (Bowen Dep. 108:12-17; Downs Dep., Exh. C, pg. 22:22-24 to 23:1-2).

12. The Board and James Scanlon are named defendants in the litigation *Rebecca A. Kerlin, et al. vs. Chicago Board of Elections and James Scanlon*, No. 16-cv-7424 (N. Dist.Ill.) before Hon. Robert Blakey. (Complaint attached as Exh. F)

13. The allegations against the Board and James Scanlon in the *Kerlin* litigation include allegations regarding improper conduct of the 5% audit by the Board after the March 15, 2016 primary election to conceal discrepancies between vote totals reported from election day as compared with vote totals obtained through the 5% audit (Id.)

14. Hon. Robert Blakey denied the Board's motion to dismiss Count I of the Kerlin complaint, which asserted 42 USC § 1983 and *Monell* claims against the Board. (Order attached as Exh. G).

15. Judge Blakey noted in his order at pg. 16, that the *Kerlin* plaintiffs have alleged a "broader trend of inconsistencies in the 'official' results generated by the Direct Recording Electronic Voting Systems in this and previous elections" and that the Board's conduct was "pervasive and widespread" and the result of the Board's *de facto* policy, practice and procedure of willfully disregarding citizens' right to vote." (Id.)

16. The election between statewide Treasurer candidates Frerichs and Cross was the subject of interest of the Democratic Party and Republican Party

attorneys from prior to Nov. 4, 2014 (Exh. F, Scanlon letter, second to last paragraph), and not because of any absentee ballots processed by Sheri Bowen. (Exh. F, James Scanlon letter, Nov. 14, 2014)

17. Sheri Bowen had performance reviews in 2004 and 2008 in which she met or exceeded expectations (Plaintiff Declaration, par. 3), and always did the best she could to perform her job tasks accurately and quickly (Id. at Par. 33).

18. Prior to 2009, the absentee ballot department had a supervisor (Otis Chism), but from 2009 – 2014, the Board refused to hire or assign a staff member as assistant supervisor for the absentee department. (Plaintiff Declaration, par. 2, 4; Chism Declaration, Exh. J).

19. Between 2009 and 2013, I was not given pay increases, while other supervisors and management employees received pay raises. (Plaintiff Declaration, par. 27).

20. Steven Cieslicki was transferred and promoted to a supervisor of absentee ballot department, at the same rate of pay as his prior position. (Response to DSOF par. 37, above; Bowen Dep, Exh. 4, Chism Declaration, Exh. J)

21. Steven Cieslicki received a promotion at the next available budget approval cycle, and has been earning $73,092.00 as the supervisor of the absentee ballot department since 2016. (Exh. H, pursuant to Fed. Rule of Evidence 902, https://www.cityofchicago.org/city/en/depts/dhr/dataset/current_employeenamessalariesandpositiontitles.html)

22. The Board's attorney, James Scanlon, developed the procedures for all post-election tasks, including the processing and counting of absentee ballots,

which did not include specific double or triple checking steps for absentee ballot sorting. (Downs Dep., Exh. C, pg. 34-35, Plaintiff Declaration, par. 6-7).

23. Plaintiff should not have been terminated for the omissions on Nov. 5, 2014, and responsibility is shared with Dawn Downs and Jeff Federke, who were not disciplined or terminated. Torres Declaration, Exh. I, par. 16).

24. Sheri Bown was a very competent, knowledgeable, hard working, thorough and honest employee that dedicated her career to the Board, and was wrongly and disparately treated by the Board when she was terminated without an investigation, and based upon false reasons (concerns about the Republican Party's perception of the Board), and no other employee was terminated for an inadvertent mistake. Bowen Declaration, Exh. A, Chism Declaration, Exh. J, Torres Declaration, Exh. I.)

                                                   Respectfully submitted,
                                                   SHERI BOWEN

                                      By:     s/ Frank Ávila
                                               Frank Ávila, Esq. – Attorney for Plaintiff

Frank Ávila, Esq.
Ávila Law Group, LLC
6601 N. Avondale / Suite 203
Chicago, IL 60631
Telephone: (773) 671-3480
Facsimile: (773)763-2301
Email: frankavilalaw@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHERI BOWEN, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 16-cv-00217 |
| CHICAGO BOARD OF ELECTION ) | |
| COMMISSIONERS, ) | Hon. Gary Feinerman |
| ) | |
| Defendants. ) | |

**CERTIFICATE OF SERVICE**

    The undersigned, an attorney, hereby certify that on May 25, 2017, a copy of the foregoing pleading was served upon counsel for Defendants via the ECF/CM filing system which delivers copies via electronic mail to all counsel of record including counsel for Defendant:

    Dan Noland
    Dykema
    10 S. Wacker Dr. #2300
    Chicago, IL 60606
    Email: **DNoland@dykema.com**

                                      s/ Frank Avila
                                      Attorney for Plaintiff